UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
Southern Division – Detroit

LITTLE CAESAR ENTERPRISES,
INC.,

    Plaintiffs and Counter Defendant,

        v.

MIRAMAR QUICK SERVICE
RESTAURANT CORPORATION, *et al*.,

    Defendants and Counterclaimants.

Case No.18-cv-10767
Hon. Terrence G. Berg

| | |
|---|---|
| Miller, Canfield, Paddock & Stone, PLC<br>Larry J. Saylor (P28165)<br>Attorney for Plaintiffs<br>150 W. Jefferson Avenue, Suite 2500<br>Detroit, MI 48226<br>(313) 963-6420<br>Saylor@millercanfield.com | Kerby Roberson, Esq.<br>BBO# 559925<br>Attorney for Defendants<br>1283 Hyde Park Avenue<br>Boston, MA 02136<br>kerby@robersonlaws.com<br>617-364-3030<br>617-364-3035 Fax<br><br>Hammoud, Dakhlallah & Associates PLLC<br>Kassem M. Dakhlallah (P70842)<br>Local Counsel for Defendants<br>6050 Greenfield, Suite 201<br>Dearborn, MI 48126<br>(313) 551-3038 phone<br>(313) 551-3136 fax<br>kd@hdalawgroup.com |

## **DEFENDANTS' AMENDED COUNTERCLAIM**

NOW COME Defendants, MIRAMAR QUICK SERVICE RESTAURANT CORPORATION, SILON CORPORATION, KHALID DRIHMI, ABDEL DRIHMI by and through their attorneys, KERBY ROBERSON and HAMMOUD, DAKHLALLAH & ASSOCIATES, PLLC and for their Amended Counterclaim against Plaintiffs, LITTLE CAESAR ENTERPRISES, INC. states as follows:

Defendants incorporate, affirm and reallege the Answer and Affirmative Defenses previously filed in their entirety.

## PARTIES, JURISDICTION AND VENUE

1. Defendant Mirarmar Quick Service Restaurant Corporation is a Massachusetts Corporation with residence and principle place of business in Hampden County, Massachusetts.

2. Defendant Miramar Quick Service Resturant Corporation owns and operates Little Ceasars Franchises located at 1380 Berlin Turnpike, in Wethersfield, Connecticut ("Resturant 3102-001"), and 1762 Boston Road, in Springfield, Massachusetts ("Resturant 3102-002").

3. Defendant Silon Corporation is a Massachusetts Corporation with residence and principle place of business in Hampden County, Massachusetts.

4. Defendnat Silon Corporation owns and operates Little Caesars franchises located at 394 Middle Turnpike West, in Manchester, Connecticut ("Resturant 3276-001"), and 306 Farmington Avenue in Hartford, Connecticut ("Resturant 3276-002").

5. Defendant Khalid Drihmi is a principal and shareholder of both defendants corporations, residing in Hampden County, Massachusetts.

6. Defendant Abdel Drihmi is a principal and shareholder of both defendants corporations, residing in Hampden County, Massachusetts.

7. Khalid Drihmi and Abdel Drihmi ("the Drihmi brothers") are franchisees of Plaintiff, Little Caesar Enterprises, Inc..  They operate the stores under the franchise agreements jointly.

8. Plaintiff Little Caesar Enterprises Inc. ("Little Caesars") is a Michigan corporation with residence and principle place of business in Wayne County, Michigan.

9. There is a pending Motion to Transfer Venue filed by Defendants.  In the event that the Court denies the Motion, the various agreements between and among the parties hereto

specify that jurisdiction and venue are proper in the Southern Division of the United States District Court for the Eastern District of Michigan.

10. The amount in controversy exceeds the sum of $75,000.00.

11. Therefore, jurisdiction and venue are proper in this Court.

## BACKGROUND

12. The Drihmi brothers are hardworking immigrants who believe in the "American Dream."

13. After a bad experience with a prior franchisor, the Drihmi brothers decided to pull in all their savings and assets to get into the pizza business with Plaintiff/Franchisor Little Caesars.

14. The Drihmi brothers purchased Miramar Quick Service Corporation on November 5, 2013, through the National Franchise's Broker.  A Jack Benof and his partner, Barry Barryburke, were the business sales brokers.

15. Before the sale, the Drihmi brothers were extensively interviewed at Little Caesars Headquarters in Detroit, Michigan.  The Drihmi brothers were asked about their immigrant backgrounds, as well as their prior business experiences abroad, and in the United States.

16. The Drihmi brothers were told that Little Caesars was committed to their success, that most of the terms contained in the franchise agreements are standard terms that are rarely enforced.

17. Prior to the sale, the Drihmi brothers were assured that Plaintiff/Franchisor is a good corporate citizen that rarely ever gets involved in the operational aspect of the business so long as the rules of the franchise were followed.

18. During their interview at Little Caesars Headquarters, the Drihmi brothers conveyed their plan to hire an intermediary to deal with the external communications with Little Caesars due to their limited ability to speak and understand English.

19. According to Little Caesars, the Drihmi brothers were required to train for six weeks in order to learn the trade and turn a profit.

20. The training consisted of making pizzas and customer interaction from 8:00 AM to 8:00 PM five days a week in a Little Caesars store. The Drihmi brothers were never paid for their training.

21. A mandatory six-week training program without pay was never conveyed to the Drihmi brothers at any time during the process of acquiring a Little Caesars franchise.

22. Plaintiff approved the sale of the Boston store to the Drihmi brothers, and there were no inspections required of the previous owners who owned 20 to 40 stores.

### Duties of Little Caesar

23. Little Caesar has a duty to provide initial and continuing services with management and operational assistance, as well as inspect and evaluate the premises in order to maintain the System's standards. These duties arise out of the rights and obligations under the following provisions of The Franchise Agreement:

   **4.5.   Marketing, Management, and Operational Assistance.** Little Caesar shall provide such initial and continuing advice and assistance to Franchisee in the marketing, management, and operation of the Restaurant as Little Caesar deems appropriate, at the time(s) and in the manner determined by Little Caesar. In the event that Franchisee requests assistance in addition to that customarily furnished to franchisees, and Little Caesar chooses to furnish such assistance, then, in such event, Little Caesar shall have the option to impose a fee, plus expenses, for providing such assistance.

   **4.6.   Inspections and Evaluations.** Little Caesar shall conduct, when and as frequently as it deems appropriate, without notice to Franchisee, inspections of Franchisee's business premises and evaluations of the Restaurant management and

operations, in order to assist Franchisee and to maintain the System's standards. Little Caesar may use designated agents, representatives, and outside consultants and vendors (including "mystery" or "secret" shoppers) to conduct such inspections, who shall have the right to take photographs, take video, remove samples of products, interview employees and customers, and inspect books, records, register tapes, and other documents relating to the operation of the Restaurant. Franchisee shall fully cooperate with such representatives during any such inspection.

**6.6.    Construction of Leasehold Improvements and Securing Approval to Open.** Construction shall commence promptly after Little Caesar's written approval of Franchisee's final plans is received, and continue uninterrupted until all necessary work is completed in accordance with the approved plans. Within five (5) days after work is completed, Franchisee shall submit a written request to Little Caesar to conduct a final inspection of the Restaurant premises and, upon receipt of such request, Little Caesar shall promptly conduct such inspection. Franchisee shall not open the Restaurant for business without the express written authorization of Little Caesar, which authorization shall specify the Opening Date of the Restaurant and may be conditioned upon Franchisee's strict compliance with the specifications of the approved final plans and System standards and completion of any pre-opening training required by Little Caesar.

24. All relevant Franchise Agreements are in Plaintiff's possession.

25. Upon the purchase of the stores, no agent from Little Caesars Corporate appeared for the sales closing. Plaintiff also failed to inspect the physical and sanitary conditions of the stores in between the time the stores were purchased and occupied by the Drihmi brothers.

26. The store was in very poor physical and sanitary conditions upon their sale to the Drihmi brothers. However, Plaintiff did not object to the sale.

27. The Drihmi brothers were unfairly forced to clean and sanitize the stores, as well as re-maintain all equipment in order to get the store up to code.

28. Three months after occupying the stores in 2014, the Drihmi brothers had to replace the saucer machine and the freezer. The baking equipment needed to be constantly monitored and tended to due to its faulty condition. These issues did not raise any concern for Plaintiff.

29. The Drihmi brothers became aware that Plaintiff knew of the stores' defective conditions, but yet allowed the sale in order to help the prior owner convey the business to more vulnerable and less experienced owners.

30. In an attempt to recoup their losses and turn profit from a deceptive situation, the Drihmi brothers decided to purchase from 8 Slices Corporation's Shawn Grossman Little Caesars Pizza franchise no. 3276-01 located in Connecticut.

31. The seller of the store took advantage of the Drihmi brothers. The compressors of the topping cooler and walk-in box broke down in the second week of the store's occupation. Plaintiff did not help cure the situation, in fact, Plaintiff's overall involvement was non-existent. Plaintiff's only role was to allow another sale of a faulty store.

32. The Drihmi brothers invested almost $2 Million in acquiring a total of 4 stores. Plaintiff approved all sales with minimal to no oversight.

33. The Drihmi brothers paid Plaintiff 10% of the gross sales every week for the last four years. This included marketing and royalty fees. The Drihmi brothers were also obligated to buy supplies through Plaintiffs' supplier, Blueline Little Caesar.

34. The Drihmi brothers were not turning a profit. Little Caesars focused only on their own revenue by doing anything to cut Defendants' expenses and maximizing only Little Caesars' own profits.

### Plaintiff made Franchisee's Duties Impossible to Meet

35. Defendants were contractually obligated to purchase all supplies from the suppliers provided by Plaintiff. However, Plaintiff's actions such as eliminating essential food ingredients and overcharging for necessities made it impossible for Defendants to meet their obligations. The following provisions state that Defendants must purchase all supplies

from Plaintiff supplier even though Plaintiff failed to provide the necessary supplies needed

to operate the business:

> **5.4.    Approved Suppliers.** Franchisee shall purchase all current and future products, ingredients, equipment, supplies, and materials used or sold by the Restaurant (including without limitation the proprietary Little Caesars spice blend, dough mix and vegetable seasonings) solely from Little Caesar's affiliate Blue Line Foodservice Distribution ("Blue Line"), or from such other entity as Little Caesar designates in writing.

> **5.4.1.**  Franchisee agrees to pay Blue Line directly for all purchases from Blue Line. Franchisee's purchases from Blue Line or other entities will be at the price in effect at that time. Franchisee acknowledges and agrees that Blue Line has the right to change its prices from time to time without notice. Franchisee agrees to pay Blue Line in accordance with Blue Line's then-current payment terms and conditions. Franchisee acknowledges and agrees that if Franchisee fails to make any payment required under this Agreement in full to Little Caesar, Blue Line, or their affiliates when due under this Agreement, Little Caesar and Blue Line reserve the right, among other remedies, to (a) suspend or refuse shipment to Franchisee of additional Blue Line products until such payment has been made in full, and/or (b) require payment for any or all future shipments of Blue Line products to be made on a cash-on- delivery (COD) basis.

> **5.4.2.**  Notwithstanding Section 5.4.1 above, Franchisee shall purchase all beverage products from the supplier(s) or source(s) that Little Caesar designates in the Manuals or otherwise in writing.

36. Through the Blueline Little Caesar supplier, the Drihmi brothers were crippled on even minor chances to turn a profit. They were contractually obligated to go through Blueline Little Caesar for everything they buy, included cleaning products as well as the pizza ingredients.

37. Blueline Little Caesar supplier sells the same supplies and ingredients to other corporations, hotels, churches, and schools at a much cheaper rate than the rate forced upon the Drihmi brothers. Yet the Drihmi brothers were still expected to turn a profit given these high supply rates while selling a Little Caesars pizza for $5.00 a unit.

38. Plaintiff regularly cut its expenses in any way it could, regardless of the impact these cuts had on the Drihmi brothers' franchises.

39. In order to cut costs, Plaintiff has eliminated many of the essential supply products – chicken, blue cheese dips, baking powder, honey mustard, barbecue sauce, etc. This practice hurts the quality of meal products. Due to these cuts, the Drihmi brothers' customers have taken their pizza needs to competitors. The Drihmi brothers are restricted from finding another supplier to fill the gap caused by the Plaintiff.

### Plaintiff Targeted Defendants with Unfair Payment Systems

40. Defendants were subjected to excessive merchant fees due to Plaintiff's merchant accounts, as well as a cash on delivery system that was not mentioned in the Franchise Agreement, even in the case of a default. The following provisions under the Franchise Agreement address the proper payment systems as well as what Little Caesar can do upon a default:

> **5.20.   Payment Systems.** Franchisee agrees to honor all credit, charge, courtesy or cash cards or other credit devices and mobile payment systems required or approved by Little Caesar in writing. Franchisee shall comply with all Little Caesar policies regarding acceptance of payment  by credit and/or debit cards and mobile payment systems, including, for example, minimum purchase requirements and/or surcharges for use of a card. Franchisee acknowledges that payment systems may require Franchisee to obtain new hardware, software, equipment and training at Franchisee's expense. Data Ownership. All data provided by Franchisee, uploaded to Little Caesar's system from Franchisee's system, and/or downloaded to Franchisee's system from Little Caesar's system,  is and  will be owned exclusively by Little Caesar, and Little Caesar will have the right to use such data in any manner that Little Caesar deems appropriate without compensation to Franchisee. In addition, all other data created or collected by Franchisee in connection with the System, or  in  connection  with Franchisee's operation of the Restaurant (including but not limited to consumer and transaction data), is and will be owned exclusively by Little Caesar during the term of, and following termination or expiration of, this Agreement. Copies and/or originals of such data must be provided to Little Caesar upon Little Caesar's request. Little Caesar hereby grants a non-exclusive license back to Franchisee  to use such data, at no additional cost, solely for the term of this Agreement and solely in connection with the establishment and operation of the Restaurant pursuant to this Agreement.

41. The Drihmi brothers are not allowed to make credit card or debit card sales using their own merchant accounts. Plaintiff has forced the Drihmi brothers to use the credit card machines of Little Caesars that charge a $.60 transaction fee for a $5.00 pizza sale.

42. For the last three years, Little Caesars has wrongfully placed the defendants on a cash on delivery ("COD") system due to an alleged default by Defendants on payments from bank errors and/or a slight delay in receiving payment. Due to the COD system, every time the Drihmi brothers submit an order to the supplier, they must pay in cash when their order arrives at the door. If no cash is given on delivery, the supplier retains the shipment.

43. The COD requirements imposed upon the Drihmi brothers created severe difficulties in balancing the day-to-day operation of the business, with paying the bills as they became due.

44. The Drihmi brothers have consistently requested an explanation as to why they have become subject to the COD system. Plaintiff has yet to provide an explanation.

45. To further erode their profits, Little Caesars entered into direct competition with the franchises. They began marketing a product called the PIZZA KIT (customers make their own pizza using prepared and pre-packaged ingredients to easily make a pizza) to neighborhood schools, churches, sports team and other community organizations.

**Little Caesar took Illegal Measures to Push out the Drihmi Brothers**

46. Little Caesar used illegal business practices to scare the Drihmi brothers into quitting the business. Practices such as supporting empty threats of other franchisee owners against the Drihmi brothers and random weekly inspections intended to harass the Drihmi brothers in front of their customers to make the business seem faulty.

47. In the face of mounting expenses and lack of a profit, the Drihmi brother tried to expand by buying additional stores. On or about November 2017, the Drihmi brothers approached a neigboring owner of 20 to 30 franchises who was looking to sell some of his stores. This owner had a close relationship with top-of-the-pyramid officials within Little Caesars Headquarters.

48. The seller promised all kinds of guarantees to the Drihmi brothers in order to get them to buy the stores from him. Luckily, the Drihmi brothers became aware of this seller's personal ties with Little Caesars and his intent to sell the Drihmi brothers failing stores. So they walked away from the deal.

49. The seller threatned the Drihmi brothers that if they do not buy his stores, he will buy theirs and put them out of business. Little Caesars was aware of these threats. In fact, Little Caesers was on board with the seller's intentions and began cooperating with him to buy out the Drihmi brothers.

50. Upon information and belief, Little Caesars shared the financial information of Drihmi brothers' stores with the former seller/proposed buyer to help him with his offer to buy the Drihmi brothers out. The Drihmi brothers continued to decline the offer to buy.

51. Soon thereafter, the Drihmi brothers were subjected to a series of inspections claiming that they violated all types of terms of their franchise agreements.  From November 2017 to January 2018, they were visited by inspectors six times.

52. The inspectors informed Drihmi brothers that Little Caesars wanted them out of business, and that they were determined to do just that.

53. Inspectors would enter the stores without notice to speak with employees and/or customers, as if they were the rightful owners.

54. One inspector muttered under his breath "I am tired of your kind," as he was exiting the store after an unannounced inspection on or about January 29, 2018.

55. The Drihmi brothers want to sell their stores to get out of the business. However, Little Caesars is conspiring with other buyers to force a fire sale, putting in jeopardy all the investments made by the Drihmi brothers.

56. Plaintiff has improperly forced Defendants to pre-pay for deliveries, in contravention of the Franchise Agreements and applicable law.

**COUNT I**
**VIOLATION OF M.G.L.C. 93A VIOLATION OF FEDERAL TRADE COMMISSION DISCLOSURE RULES**

55. Defendants incorporate and re-allege all previous paragraphs of this Counterclaim as though fully restated herein.

56. Prior to the sale of every store to Defendants, Little Caesar Enterprises, Inc., had the right to approve or disapprove the sale based on information it possessed on the condition and profitability of the store.

57. Little Caesar Enterprises, Inc. failed to disclose material facts in the negotiations, by endorsing the franchisee-sellers' representations on the financial conditions of the stores, in violation of FTC rules.

58. Little Caesar Enterprises, Inc. misrepresented the facts by assuring a profitable business deal to Defendants, while none of the stores were profitable and had serious structural issues that prevented Defendants from making a profit.

59. Little Caesar Enterprises, Inc., further promised the defendants it would work with them to ensure their success.

60. The defendants relied on the representations, approval of sales, and promises of Little Caesar Enterprises, Inc. to invest over $2 million in acquiring four stores.

61. The stores were pre-existing.  Little Caesar Enterprises, Inc. cannot and should not be allowed to hide behind the waiver provisions of its "boilerplate Franchises agreement."

62. Little Caesar Enterprises, Inc. omitted material facts in the offer and sale of its franchises.

63. Little Caesar Enterprises, Inc. broke its promises to be engaged in fair dealing.

64. Little Caesar Enterprises, Inc. by its action and omissions committed unfair and deceptive acts in the conduct of its businesses with Defendants.

65. As a result of their reliance on Little Caesar Enterprises, hard labor in Defendants efforts is what keeps their businesses barely running.

**COUNT II**
**VIOLATION 93A, Sec. 11 UNFAIR METHOD OF COMPETITION**

66. Defendants incorporate and re-allege all previous paragraphs of this Complaint as though fully restated herein.

67. Little Caesar Enterprises, Inc engaged in unfair methods of competition against the Defendants.

68. Little Caesar Enterprises, Inc willfully and knowingly engaged in direct competition with the Defendants by offering the same products in the Defendants' market, destroying any possibility for the Defendants' franchises to make a profit.

69. In violation of the Franchise agreement, Little Caesar Enterprises, Inc requires that Defendants use a credit card machine that charges a higher percentage on each sale.  The machines belong to Little Caesar Enterprises, Inc or Little Caesar Enterprises, Inc benefits from each sale.

70. Without good cause Little Caesar Enterprises, Inc and its supplier Blueline Food Service Distribution conspire to fabricate instances of defaults to impose tighter restrictions and fees on Defendants.

71. Regardless of the reason for being late (whether it is bank issue or not) Little Caesar Enterprises, Inc and its supplier Blueline Food Service Distribution imposed an unjust requirement to pay Cash on Delivery ("COD") for all items the Defendants are obligated to have to run their business.

72. Little Caesar Enterprises, Inc and its supplier Blueline Food Service Distribution conspired to impose a requirement that the Defendants prepay for all items from food to cleaning products. The conducts of Little Caesar Enterprises, Inc and its supplier Blueline Food Service Distribution tantamount to a conspiracy to drive the Defendants out of business

**COUNT III**
**VIOLATION OF ANTI-TRUST LAWS – PRICE FIXING AND RESTRAINT OF TRADE**

73. Defendants incorporate and re-allege all previous paragraphs of this Complaint as though fully restated herein.

74. Little Caesar Enterprises, Inc and its supplier Blueline Food Service Distribution fixed the price of each product that is sold to Defendants.

75. It is a fact that Blueline Little Caesar supplier sells the same supplies and ingredients to other corporations, hotels, churches, and schools at a much cheaper rate than the rate forced upon the Drihmi brothers. Yet the Drihmi brothers were still expected to turn a profit given these high supply rates while selling a Little Caesars pizza for $5.00 a unit.

76. Defendants were forced to abide by the most expensive methods of payment as well as remain subject to high interest rates and penalties while Plaintiff was unjustly enriched due to these restrains.

77. Due to Plaintiff's price fixing and restraints, Defendants have suffered damages to their businesses and remain operating at a loss.

## COUNT IV
## DISCRIMINATION BASED ON RACE AND NATIONAL ORIGIN

78. Defendants incorporate and re-allege all previous paragraphs of this Complaint as though fully restated herein.

79. The conducts of Little Caesar Enterprises, Inc toward Defendants are so unjust that Defendants consider them oppressive. Defendants inquired of other franchisees and found that other franchisees are treated much better.

80. On different occasions, Defendants received default and violation notices from Little Caesar Enterprises, Inc, Defendants found that these defaults were also addressed to other franchisees who are of Arabic descent with stores located in different states.

81. Defendants also found out that no other neighboring franchisees have been mistreated as they are. No other Franchisees were put on a Pay on Delivery System for an alleged default. Lastly, no other franchisees that Defendants inquired were constantly and purposely harassed by Plaintiff's inspectors and agents in front of customers in order to bring down business.

82. The agents of Little Caesar Enterprises, Inc who inspect the defendants' stores make statements in disgust towards Defendants as a class of people in violation of their civil rights.

83. At the very minimum, this conduct shows that Little Caesar Enterprises, Inc does not like the Defendants for no particular reason. However, a reasonable and prudent person can

look at the events that have led up to this action and conclude that Defendants have been

victims of racial discrimination.

## COUNT V
## VIOLATIONS OF THE MICHIGAN FRANCHISE INVESTMENT ACT

84. Defendants incorporate and re-allege all previous paragraphs of this Complaint as though
fully restated herein.

85. The relationship between Defendants and Plaintiff is that of a "franchisor" and
"franchisee", respectively, under MCL 445.1501 *et seq* (the "Michigan Franchise
Investment Act).

86. The conduct of the Plaintiffs is a violation of the Michigan Franchise Investment Act in
that Plaintiffs are attempting to enforce a provision in the Franchise Agreements,
purportedly allowing it to terminate the franchise without cause, which provision is
prohibited under the Michigan Franchise Investment Act.

87. Plaintiffs have also improperly altered a material term of the Franchise Agreements – the
payment term – unilaterally and through fraud and deception, in violation of the Michigan
Franchise Investment Act.

88. Plaintiffs have also grossly misrepresented the cost of opening and operating the franchise
locations, in violation of the Michigan Franchise Investment Act.

89. Plaintiffs have further contrived alleged breaches of the various Franchise Agreements in
violation of the Michigan Franchise Investment Act.

90. Plaintiffs have further attempted to thwart Defendants' efforts to sell their various franchise
locations, in violation of the Michigan Franchise Investment Act.

91. Plaintiffs have further discriminated against Defendants, in violation of the Michigan Franchise Investment Act.

92. Plaintiffs have further engaged in disparate treatment of Defendants in comparison to other franchisees, in violation of the Michigan Franchise Investment Act.

93. Plaintiffs have further diverted franchisee resources for their own use, in violation of the Michigan Franchise Investment Act.

94. As a result of Plaintiffs' conduct, Defendants have suffered damages.

95. The conduct of the Plaintiffs in violation of the Michigan Franchise Investment Act has and will cause Defendants substantial damages, some of which cannot be adequately remedied by monetary damages alone, and which damages are likely to include the virtual destruction of Defendants' businesses.

**COUNT VI**
**VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT AND CONNECTICUT FRANCHISE ACT**

96. Defendants incorporate and re-allege all previous paragraphs of this Counterclaim as though fully restated herein.

97. Connecticut General Statutes § 42–133e (b) provides in relevant part: " 'Franchise' means an oral or written agreement or arrangement in which (1) a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor ... and (2) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising or other commercial symbol designating the franchisor or its affiliate...."

98. Connecticut General Statutes § 42–133f (a) provides in relevant part: "No franchisor shall, directly, or through any officer, agent or employee, terminate, cancel or fail to renew a franchise, except for good cause which shall include, but not be limited to the franchisee's refusal or failure to comply substantially with any material and reasonable obligation of the franchise agreement...."

99. Connecticut General Statutes § 42–110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

100. Defendants' stores are "franchises" under Connecticut law.

101. Defendants are "franchisees" under Connecticut law.

102. Plaintiff is a "franchisor" under Connecticut law.

103. Plaintiff has violated the above provisions of Connecticut law by wrongfully terminating Defendants' franchises without cause, wrongfully placing Defendants on COD and prepayment terms, wrongfully fabricating alleged breaches of the Franchise Agreements, wrongfully retaliating against Defendants for not selling their franchises to Plaintiff's favored franchisees, and other conduct.

104. As a result, Defendants have suffered damages.

## COUNT VII
## BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

105. Defendants incorporate and re-allege all previous paragraphs of this Complaint as though fully restated herein.

106. The terms of the Franchise Agreements between the parties were drafted by Plaintiffs and were not subject to input by Defendants.

107.     Plaintiffs have alleged false breaches of the Franchise Agreements by Defendants, including: falsely alleging late and short payments; fabricating claims that Defendants are not selling approved products; ; fabricating negative inspection reports; and other false breaches.

108.     Plaintiffs have also expressed their belief – and have attempted to carry out their belief – that they have the unfettered ability to unilaterally terminate Defendants' franchises without notice.

109.     The Franchise Agreements are subject to the covenant of good faith and fair dealing implied by law, which covenant imposes on Plaintiffs the obligation of exercising their discretion in good faith and for good business reasons in a manner that is fair and reasonable to Defendants under the circumstances.

110.     At all times in entering into the Agreements, and in performance thereunder, Defendants relied upon the obligations of good faith and fair dealing imposed by the law on Plaintiffs, and specifically in making investments in the Little Caesars franchises and declining other business opportunities. Defendants relied on the implied obligation that Plaintiffs would not terminate the Agreements except for good business reasons concerning Defendants' performance thereunder, and would not interfere in Defendants' performance under the Agreements.

111.     By their conduct as set forth above, Plaintiffs have breached the covenant of good faith and fair dealing.

112.     As a result, Defendants have suffered damages which are continuing to accrue.

**COUNT VIII**
**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP OR EXPECTANCY**

113.    Defendants hereby incorporate and re-allege all previous allegations as though fully restated herein.

114.    At all times relevant to this lawsuit, Defendants had an existing relationship with prospective purchaser franchisees in Massachusetts and Connecticut, and an expectation of continuing this relationship and the benefits thereof.

115.    Plaintiffs knew about these relationships and expectancies.

116.    Plaintiffs wrongfully solicited, diverted and took away Defendants' relationship with the prospective purchaser franchisees.

117.    Plaintiffs have also attempted to induce – and did induce – the prospective purchaser franchisees to terminate their relationship with Defendants.

118.    Plaintiffs' actions have caused the prospective purchaser franchisees to terminate their business relationship with Defendants.

119.    Plaintiffs' conduct was knowing, intentional, improper, and malicious.

120.    These actions were by no means accidental or negligent— they were calculated and specific acts. These are per se wrongful acts – "an act that is inherently wrongful or one that is never justified under any circumstances." Patillo v. Equitable Life Assurance Soc'y, 502 N.W.2d 696, 700 (Mich. Ct. App. 1993).

121.    These acts are prima facie evidence of an act that is inherently wrongful.

122.    These acts are also acts done with malice because "it is the intentional doing of a wrongful act without justification or excuse." Feldman v. Green, 360 N.W.2d 881, 881 (Mich. App. 1984).

123.     As a direct and proximate result of Plaintiffs' wrongful conduct, Defendants have suffered substantial economic injury, loss of goodwill, harm to its business reputation, loss of esteem and standing in the business community, and loss of business opportunities.

124.     Further, the actions of Plaintiffs are causing lost profit damages, loss of good will, and loss of business reputation to accumulate every day.

**COUNT IX**
**TORTIOUS INTERFERENCE WITH CONTRACTS**

125.     Defendants hereby incorporate and re-allege all previous allegations as though fully restated herein.

126.     At all times relevant to this lawsuit, Defendants had contracts with prospective purchaser franchisees in Massachusetts and Connecticut and an expectation of continuing this relationship and the benefits thereof.

127.     Plaintiffs knew about these contracts.

128.     Plaintiffs wrongfully solicited, diverted and took away Defendants' relationship with the prospective purchaser franchisees.

129.     Plaintiffs have also attempted to induce – and did induce – the prospective purchaser franchisees to breach their contracts with Defendants.

130.     Plaintiffs' conduct was knowing, intentional, improper, and malicious.

131.     These actions were by no means accidental or negligent— they were calculated and specific acts. These are per se wrongful acts – "an act that is inherently wrongful or one that is never justified under any circumstances." Patillo v. Equitable Life Assurance Soc'y, 502 N.W.2d 696, 700 (Mich. Ct. App. 1993).

132.     These acts are prima facie evidence of an act that is inherently wrongful.

133.     These acts are also acts done with malice because "it is the intentional doing of a wrongful act without justification or excuse."  Feldman v. Green, 360 N.W.2d 881, 881 (Mich. App. 1984).

134.     As a direct and proximate result of Plaintiffs' wrongful conduct, Defendants have suffered substantial economic injury, loss of goodwill, harm to its business reputation, loss of esteem and standing in the business community, and loss of business opportunities.

135.     Further, the actions of Plaintiffs are causing lost profit damages, loss of good will, and loss of business reputation to accumulate every day.

## COUNT X
## FRAUDULENT INDUCEMENT (Franchise Agreements)

136.     Defendants hereby incorporate and re-allege all previous allegations as though fully restated herein.

137.     Plaintiffs made representations to Defendants that they would abide by the Franchise Agreement so long as the Defendants acted in good faith and performed their rights and obligations under the Franchise Agreement. Further, Plaintiffs went so far to say that potentially detrimental terms are rarely ever enforced, and Defendants have zero worries. That all these terms are just "procedural stuff and need to be included". These promises were made to the Drihmi brothers at Little Caesar Corporate's office.

138.     Plaintiffs' representations were material, as they served as a basis for Defendants' decision to agree to Franchise Agreements.

139.     Plaintiffs' representations were false, as they almost immediately disavowed the Franchise Agreements and have clearly stated their intention not to abide by them.

140.     Plaintiffs knew that the representations were false or made it recklessly without

knowledge of its truth and as a positive assertion.

141.     Plaintiffs made the representations with the intention that Defendants would act upon the representations.

142.     Defendants did act in reliance upon the representations by agreeing to the terms in the Franchise Agreements and investing over $2million into Plaintiff's franchise system.

143.     Defendants have suffered damages as a result.

144.     As a further result of Plaintiffs' fraudulent misrepresentations, Defendants have suffered substantial damages that cannot be adequately remedied with money damages alone and which have and will cause Defendants irreparable harm, including but not limited to lost business opportunities and the likely failure of Defendants' businesses.

## COUNT XI
## ANTICIPATORY BREACH OF CONTRACT

145.     Defendants hereby incorporate and re-allege all previous allegations as though fully restated herein.

146.     Plaintiffs and Defendants are parties to various contracts, including the Franchise Agreements.

147.     Under the express terms of the Franchise Agreements, Defendants have the right to peacefully operate their franchise locations.

148.     Also, under the Franchise Agreements, Defendants have a right to payment terms.

149.     Under the terms of the Franchise Agreements, Defendants have a right to operate their franchise locations in the way they please so long as they did not violate the terms within the franchise agreements. These rights include the right to payment terms. Defendants instead, were subject to Cash on Delivery systems as well as pre-payment systems without cause or right.

22

150.     Plaintiffs, by their statements and conduct, have violated the terms of the Franchise Agreements.

151.     Plaintiffs claim that they have terminated the Franchise Agreements and have initiated this lawsuit to further that end.

152.     Whether they were unable or unwilling to perform, Plaintiffs' anticipatory breach of the Agreements entitles Defendants to breach of contract damages.

153.     The financial loss to Defendants exceeds Two Million ($2,000,000.00) Dollars.

## COUNT XII
## BREACH OF CONTRACT

154.     Defendants hereby incorporate and re-allege all previous allegations as though fully restated herein.

155.     Plaintiffs and Defendants are parties to various contracts, including the Franchise Agreements.

156.     Under the express terms of the Franchise Agreements, Defendants have the right to peacefully operate their franchise locations.

157.     Also, under the Franchise Agreements, Defendants have a right to payment terms.

158.     Under the terms of the Franchise Agreements, Defendants have a right to operate their franchise locations in the way they please so long as they did not violate any terms within the franchise agreements. These rights include the right to payment terms. Defendants instead, were subject to Cash on Delivery systems as well as pre-payment systems without cause or right.

159.     Plaintiffs have manufactured breaches of the Franchise Agreements by refusing Defendants their rights to payment terms, improperly interfered with Defendants' efforts to peacefully operate their franchises, fabricated inspection failures, among other breaches

of the Franchise Agreements.

160.     Plaintiffs have purported to terminate the Franchise Agreements and have initiated

this lawsuit to advance that end.

161.     Plaintiffs, by their statements and conduct, have violated the Franchise

Agreements, as well as stated their intention to continue to violate these agreements.

162.     Plaintiffs' conduct constitutes a material breach of the Franchise Agreements.

163.     As a result of Plaintiffs' breaches, Defendants have suffered damages.

164.     These damages Include, without limitation, loss of capital contribution, loss of

sales, loss of accounts payable, lost business opportunities, loss of profits, and loss of

business reputation.

165.     The financial loss to Defendants exceeds Two Million ($2,000,000.00) Dollars.

## COUNT XIII
## UNJUST ENRICHMENT

166.     Defendants hereby incorporate and re-allege all previous allegations as though fully

restated herein.

167.     Plaintiffs promised and misrepresented to Defendants an almost guaranteed profit

if Defendant buys and operates a Little Caesars store.

168.     Acting pursuant to that promise, Defendants signed the Franchise Agreement and

have paid Plaintiff for four Little Caesars Stores. The Drihmi brothers also paid Plaintiff

10% of the gross sales every week for the last four years, this included marketing and

royalty fees.

169.     Plaintiffs have obtained the financial benefit of having additional stores in markets

that up to that point they did not participate in as well as benefits in sales, and marketing,

and royalty fees.

170.     Defendants have been fleeced by Plaintiffs, who now claim that the franchises are terminated and that Defendants have no right to operate them.

171.     Under these facts, an inequity has resulted.

172.     Plaintiffs have gained at Defendants' expense.

173.     Therefore, Plaintiffs have been unjustly enriched.

174.     Defendants have therefore been damaged.

**COUNT XIV**
**DECLARATORY RELIEF**

175.     Defendants hereby incorporate and re-allege all previous allegations as though fully restated herein.

176.     The parties have a dispute regarding their rights and obligations under the Franchise Agreements.

177.     Defendants contend that they have been deceived and mistreated since the day they contracted with Plaintiffs. Further, Defendants contend that they were fraudulently induced to sign the Franchise Agreement under the reasonable impression that they will surly profit and granted the freedom to operate their businesses as they please. However, Defendants have been the target of corporate bullying by the Plaintiffs in order to push them out and reap all of the benefits gained by the Defendants in the process, a direct violation of the guaranteed rights set forth in the Franchise Agreement.

178.     Defendants contend that they have a right to be on payment terms, rather than COD.

179.     Defendants contend that they have a right to sell and/or otherwise transfer their franchises without being hindered in doing so by Plaintiffs.

180.     Defendants contend that they are not in breach of the various Franchise Agreements.

181.     Plaintiffs dispute each and every one of these contentions set forth above.

182.     The Court is therefore called upon to resolve these disputes.

## **REQUEST FOR RELIEF**

Wherefore Defendants pray for the following relief:

A.     Monetary damages in excess of Two Million ($2,000,000.00) Dollars;

B.     A Temporary Restraining Order, and Preliminary and Permanent Injunctive relief on prohibiting the Plaintiffs and their agents and employees from:

    a.  Terminating the Agreements without cause; or
    b.  Attempting to enforce provisions of the Agreements prohibited by the Michigan Franchise Investment Act,  Connecticut Unfair Trade Practices Act and Connecticut Franchise Act and/or M.G.L.C. 93A; or
    c.  Any further violations of the Michigan Franchise Investment Act, Connecticut Unfair Trade Practices Act and Connecticut Franchise Act and/or M.G.L.C. 93A.

C.     A Temporary Restraining Order, and Preliminary and Permanent Injunctive relief requiring Plaintiffs to abide by the terms of the Franchise Agreements;

D.     A Declaratory Judgment in Defendants' favor pursuant to Count XIV;

E.     Specific performance of the Franchise Agreements;

F.     Punitive damages;

G.     Exemplary Damages;

H.     Attorney Fees;

I.     Costs; and

J.     Such other relief as the Court deems appropriate.

Respectfully Submitted,

/s/ Kerby Roberson
Kerby Roberson, Esq.
BBO# 559925
Attorney for Defendants
1283 Hyde Park Avenue
Boston, MA 02136
kerby@robersonlaws.com
617-364-3030
617-364-3035 Fax

HAMMOUD DAKHLALLAH
& ASSOCIATES, PLLC

/s/ Kassem M. Dakhlallah
Kassem M. Dakhlallah (P70842)
Local Counsel for Defendants
6050 Greenfield Rd., Ste., 201
Dearborn, MI 48126
Ph.: (313) 551-3038
Dated: June 11, 2018                    Email: kd@hdalawgroup.com

## CERTIFICATE OF SERVICE

I, Kassem Dakhlallah, hereby certify that on June 11, 2018, I caused Defendants' Amended Counterclaim and this Certificate of Service to be served by the Court's electronic filing system on all individuals designated therein as service recipients for this case.

/s/ Kassem M. Dakhlallah
Kassem M. Dakhlallah (P70842)